**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. |
| | ) | |
| GARY / CHICAGO INTERNATIONAL | ) | |
| AIRPORT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

NOW COMES the Plaintiff, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA (National Union), by and through its attorneys, Tressler LLP, and for its Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202 against Defendant, Gary / Chicago International Airport Authority (GCIAA), states as follows:

**NATURE OF THE ACTION**

1.      This is a civil action brought by National Union seeking a declaration that National Union has no duty to defend or indemnify GCIAA with regard to certain agreements entered into between GCIAA and the Indiana Department of Environmental Management (IDEM).

**PARTIES**

2.      National Union is an insurance company organized and existing under the laws of the State of Pennsylvania with its principal place of business in Pennsylvania.

3.      GCIAA is a political subdivision organized and existing under the laws of the State of Indiana since sometime after February 7, 1993 with its principal place of business in Indiana. On information and belief, GCIAA owns and operates the Gary / Chicago International Airport located in Gary, Indiana.

**JURISDICTION AND VENUE**

4.      This is an action for declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

5.      Jurisdiction is proper before this Court pursuant to 28 U.S.C. §§ 1332(a) and 2201 because Plaintiff, National Union, is a citizen of a different state than the Defendant, GCIAA, and the sum in controversy, exclusive of interest and costs, exceeds $75,000.

6.      The Chicago/Gary Regional Airport Authority (CGRAA) was created by the joint action of the City of Chicago and the City of Gary by ordinances passed by those cities on or about April 17, 1995 for the purpose of, *inter alia*, using taxes collected at O'Hare and Midway Airports in Chicago, Illinois to fund the expansion of the Gary/Chicago International Airport located in Gary, Indiana (the Compact).  Over the years taxes in excess of $1 million collected by the City of Chicago and/or the CGRAA have been paid to GCIAA to fund, in part, the expansion of the Gary/Chicago International Airport in Gary, Indiana.

7.      Venue is proper in this district pursuant to 28 U.S,C. 1391(b)(1) and (2) because the National Union insurance policies at issue in this case were negotiated and produced by McAlear of IL Inc in Chicago, Illinois and were countersigned by AIG Aviation (Illinois) Corporation in Chicago, Illinois.

8.      In addition, Venue is proper in this district pursuant to 28 U.S.C. 1391(b)(1) and (2) because, on information and belief, by virtue of the CGRAA compact, GCIAA has conducted business to a substantial degree in the State of Illinois, the funds collected by and through the City of Chicago and/or CGRAA were used, in part, to fund the Gary/Chicago International Airport expansion which underlies this lawsuit and the insurance contracts at issue were negotiated and countersigned in Chicago, Illinois.

9.      There is an actual and ripe controversy between National Union and GCIAA because GCIAA has alleged that it is an insured under the National Union policies and requested that National Union defend and indemnify it with respect to alleged costs and expenses associated with certain agreements that GCIAA voluntarily entered into with the Indiana Department of Natural Resources and other governmental entities relating to runway expansion activities at the Gary/Chicago International Airport.

## **COMMON FACTS**

10.      National Union issued two policies of insurance to the Gary Regional Airport (GRA) as the named insured.  Policy No. AP 479-6870 was effective from February 7, 1991 to February 7, 1992, and Policy No. AP 322-13-50 was effective from February 7, 1992 to February 7, 1993.  Both policies were negotiated and countersigned by AIG Aviation (Illinois) Corporation in Illinois and are referred to hereafter as "National Union Policies".  On information and belief, both National Union Policies contain the same operative provisions.  A true and correct copy of Policy No AP 322-13-50 is attached hereto as **Exhibit A**.  A copy of Policy No. AP 470-6870 has not been located by either National Union or GCIAA as of the filing of this lawsuit.

3

11.    The National Union Policies contain, *inter ali*a,  the following provisions:

**COMPREHENSIVE GENERAL LIABILITY INSURANCE - COVERAGE PART**

**I.    COVERAGE A — BODILY INJURY LIABILITY**
**COVERAGE B — PROPERTY DAMAGE LIABILITY**

*The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of*

        *A.    bodily injury or*

        *B.    property damage*

*to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.*

<u>*EXCLUSIONS*</u>

*This insurance does not apply:*

*(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named Insured will be done in a workmanlike manner;*

        *\*      \*      \**

*(f) to **property damage** to*

    *(1) property owned or occupied by or rented to the **insured**;*

    *(2) property used by the **insured**, or*

    *(3) property in the care, custody or control of the **insured** or as to which the **insured** is for any purpose exercising physical control; ...*

        *\*      \*      \**

4

*II. PERSONS INSURED*

*Each of the following is an insured under this insurance to the extent set forth below:*

*\*        \*        \**

*(c)  if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such.*

*IV. POLICY PERIOD; TERRITORY*

*This insurance applies only to bodily injury or property damage which occurs during the policy period within the policy territory.*

*\*        \*        \**

*DEFINITIONS*

*When used in this policy (including endorsements forming a part hereof):*

*\*        \*        \**

*"incidental contract" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) elevator maintenance agreement;*

*"insured" means any person or organization qualifying as on insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;*

*\*        \*        \**

*"named insured" means the person or organization named in Item 1 of the declarations of this policy;*

*\*        \*        \**

*"occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured;*

*\*        \*        \**

5

### *CONDITIONS*

*       *       *

*4.  Insured's Duties in the Event of Occurrence, Claim or Suit.*

*(a)  In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or its Aviation Managers or any of its authorized agents as soon as practicable. The named insured shall promptly take at his expense all reasonable steps to prevent other bodily injury or property damage from arising out of the same or similar conditions but such expense shall not be recoverable under this policy.*

*(b)  If claim is made or suit is brought against the insured, the insured shall immediately forward to the company or its Aviation Managers every demand, notice, summons or other process received by him or his representative.*

*(c)  The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.*

*       *       *

*9.  Assignment. Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the named insured shall die, such insurance as is afforded by this policy shall apply (1) to the named insured's legal representative, as the named insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the named insured, to the person having proper temporary custody thereof, as insured, but only until the appointment and qualification of the legal representative.*

### *NOISE AND POLLUTION AND OTHER PERILS EXCLUSION CLAUSE*

*1.  This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:*

*       *       *

6

     *(b)  pollution and contamination of any kind whatsoever,*

*    *    **

   *2.  With respect to any provision in the Policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend:*

     *(a)  claims excluded by paragraph 1*

12.    Upon information and belief sometime around 1999, GCIAA submitted a revised Airport Layout Plan to the FAA seeking approval of improvements to the airport.  The revised plan called for runway expansion and included the acquisition of the Conservation Chemical Site ("CCS") which was adjacent to the then existing airport properly.

13.    CCS was developed for industrial use at least by the 1950's.  CCS was operated as a hazardous waste treatment, storage and disposal facility from 1967 through 1985. The CCS was abandoned in 1985.  Prior to GCIAA's acquiring CCS, removal activities under CERCLA and response actions under the federal Oil Pollution Act were conducted at the CCS by EPA and responsible parties.

14.    At least as early as 1999, the GCIAA knew that the CCC was contaminated with toxic chemicals, hazardous substances and pollutants and that pollutants were allegedly migrating off the CCS property.  In a June 22, 1999 letter from USEPA to the "Gary/Chicago Airport Authority District (sic)", USEPA reported the following: (a) oil discharging from the CCS was entering a water drainage ditch on airport property; (b) USEPA was addressing the oil contamination at airport property; (c) USEPA did not plan to issue a cleanup order to GCIAA; (d) USEPA and FAA requirements regarding remediation/construction differ, with FAA construction requirements calling for cement piping rather than metal piping at a somewhat

7

added cost; (e) since airport runway expansion in the area of the remediation/construction area is planned, GCIAA was invited by USEPA to voluntarily participate in the work so that, consistent with FAA requirements, cement piping could be installed.  A true and correct copy of a June 22, 199_ letter from the USEPA to Gary/Chicago Airport Authority District (sic) is attached as **Exhibit B**.

15.    In a February 7, 2000 letter from the USEPA to "Gary/Chicago Airport Authority District" (sic), the USEPA reported the following:  (a) USEPA continued to mitigate release of oil to the ditch on airport property by operating a pump and treat system to recover the oil; (b) third parties responsible for contamination at the CCS agreed to finance certain of the work to meet FAA construction and USEPA environmental concerns; and (c) USEPA proposed that GCIAA voluntarily take over the operations and maintenance of the pump and treat system.  A true and correct copy of a February 7, 2000 letter from the USEPA to "Gary/Chicago Airport Authority District" (sic) is attached as **Exhibit C**.

16.    On April 3, 2001, a Quit Claim Deed for CCS was prepared by Lake County (IN) commissioners purporting to transfer the CCS to the "Gary-Chicago Airport Authority." A true and correct copy of an April 3, 2001 a Quit Claim Deed is attached as **Exhibit D.**  The GCIAA did not accept the deed until July 8, 2013, when the GCAA Board accepted the deed.  Title to CCC was transferred to GCAA in order to expand an existing runway at the airport onto the CCS as part of an economic development plan.

17.    In January of 2002, a CCS Final Report prepared in response to an Administrative Order on Consent was issued.

a.  The report was issued regarding a February 4, 1999 Administrative Order and a November 9, 2001 Amended Administrative Order, both entered into by USEPA and Potentially Responsible Parties (PRPs) at the CCS;

b.  A March, 1999 work plan regarding the CCS by the PRPs that was approved by USEPA on April 27, 1999, included installation of a sewer on airport property.

A true and correct copy of the January 2002 CCS Final Report is attached as **Exhibit E**.

18.    On or about October 17, 2001, the FAA conditionally approved the GCIAA's revised Airport Layout Plan conditioned upon GCIAA's voluntary agreement to accept the responsibility for the existing condition of the CCS that required mitigation measures.

19.    In March, 2005, the Federal Aviation Authority ("FAA") issued its Record of Decision (ROD) for a Proposed Master Plan Development the Gary/Chicago International Airport including a runway extension and runway safety area enhancements.   A true and correct copy of the March 2005 Record of Decision is attached as **Exhibit F**.

a.  In order to address airport needs and changes in FAA airport design standards, the airport prepared an update to its master plan.

b.  In order to conform to FAA standards and meet the needs of existing and future uses, proposed actions and improvements included, among other things, extending a runway and improving facilities.

c.  The airport development would occur on airport owned land and land proposed to be acquired.

d.  This plan was conditionally approved by the FAA on October 17, 2001, and final approval was provided in this Final Report.

9

e.  It was determined that this action fully achieved the purposes and needs to provide sufficient runway length and accommodate then current, reasonably anticipated air transportation demand and bring the subject runway into conformity with FAA design criteria.

f.  This approval was conditioned on GCIAA's acceptance of responsibility for existing conditions of property GCIAA was to acquire.

g.  One of the properties to be acquired and for which remediation was also needed was the CCS, where soil and groundwater contamination was located and at which active remediation was being conducted.

h.  The ROD provided that USEPA required a definitive statement that the GCIAA recognized its responsibility to address any contamination, including assumption of costs, coming from, among other sites, the CCS.

20.    In July of 2007, GCIAA conducted a Phase I Environmental Site Assessment regarding the CCS, which reported that, during the 1950's and 1960's, the site was operated as an oil refinery and that, during the 1960's, the 1970's and 1980's, the site was operated as a chemical and hazardous waste storage and treatment facility; the report also documented past releases of pollutants at the CCS. A true and correct copy of the Phase I Environmental Site Assessment is attached as **Exhibit G.**

21.    On February 29, 2008, at the request of GCIAA, the Indiana Department of Environmental Management ("IDEM"), pursuant to the Indiana Brownfield's Program, issued a Comfort Letter to the GCIAA regarding potential liability, and the need, for response action at the CCS.

a. The Comfort Letter identified contaminants at the CCS.

b. IDEM found, in part, that the GCIAA did not cause, contribute to or knowingly exacerbate the release of Hazardous Substances or petroleum at the CCS.

A true and correct copy of the February 9, 2008 Comfort Letter is attached as **Exhibit H**.

22.    In July of 2012, GCIAA conducted another Phase I Environmental Site Assessment of the CCS.  It detailed the history of the site, soil and groundwater contamination there and remediation efforts at the CCS, including by USEPA.  GCIAA acknowledged its awareness of the contaminated condition at the site.  At the time the report was prepared, GCIAA had not yet accepted title or deed to the CCS.  A true and correct copy of the July 2012 Phase I Environmental Site Assessment is attached as **Exhibit I**.

23.    In a September 15, 2012 Environmental Restrictive Covenant executed by the GCIAA regarding the CCS**,** the GCIAA covenanted, among other things, not to use the site for residential or agricultural purposes, not to use or permit use of groundwater at the site unless for site investigation or remediation, not to permit excavation of soil at the site and to maintain and operate the USEPA installed oil recovery system until a more effective system is installed and operational.  A true and correct copy of the September 15, 2012 Environmental Restrictive Covenant is attached as **Exhibit J**.

24.    In a March 11, 2013 letter from the GCIAA to IDEM, GCIAA reported that, as part of its runway extension project, a GCIAA contractor doing clearing and excavation work on the CCS noticed chemical odors and suggestions are provided for investigation and management of debris.  A true and correct copy of the March 11, 2013 letter from GCIAA to IDEM is attached as **Exhibit K**.

25.    In a March 28, 2013 letter to GCIAA, IDEM confirmed that the CCS is in an Area of Contamination (AOC) which is in and impacted by the runway expansion program.  A true and correct copy of the March 28, 2013 letter from IDEM to GCIAA is attached as **Exhibit L**.

26.    On July 8, 2013, GCIAA finally acquired title to the CCS by accepting the Quit Claim Deed previously prepared in April, 2001.  See **Exhibit M** attached, a December 15, 2015 Continuing Obligation Agreement and Covenant Not to Sue entered into between IDEM and GCIAA**.**

27.    In an April, 2016 Groundwater Characterization Work Plan, GCIAA stated that the airport expansion design required acquisition of the CCS in July, 2013.  A true and correct copy of the April 2016 Groundwater Characterization Work Plan is attached as **Exhibit N**.

28.    On September 8, 2014, IDEM notified GCIAA's attorney by letter that testing results on airport property "require further investigation and possible remediation."  The letter also invited GCIAA's attorney "to discuss the potential for adding this matter to the proposed settlement agreement."   A true and correct copy of IDEM's letter of September 8, 2014 is attached hereto as **Exhibit O**.

29.    On September 9, 2014, GCIAA's attorney sent a copy of the IDEM letter of September 8, 2014 to Old Republic Insurance Company, American Eagle Insurance Company, and American Insurance Company with a demand that those insurance companies respond to the IDEM "claim".  True and correct copies GCIAA's letters to these insurers are attached hereto as **Exhibits P, Q and R**.

30.    On November 9, 2015, more than a year after sending his letter to the other insurers, GCIAA's attorney sent a letter tendering the purported "claim" of IDEM to National

Union.  The letter sent to National Union on November 9, 2015 was identical to the letters sent

to other insurers more than a year earlier and also included a copy of IDEM's September 8,

2014 letter.  A true and correct copy of the letter from GCIAA's attorney to National Union

dated November 9, 2015 is attached hereto as **Exhibit S**.

31.    On December 15, 2015, GCIAA's attorney provided National Union with an

unsigned copy of what was purported to be the final draft of a Continuing Obligation

Agreement and Covenant Not to Sue (the Agreement) between IDEM and GCIAA.  Some, but

not all of the attachments referred to in the Agreement were included.  A true and correct copy

of the December 15, 2015 letter from GCIAA's attorney to National Union without attachments

is attached hereto as **Exhibit T**.

32.    On information and belief, the Continuing Obligation Agreement and Covenant

Not to Sue is the same "Settlement Agreement" that was referred to in **Exhibit O,** IDEM's

September 8, 2014 letter to GCIAA.

33.    On December 28, 2015, at the request of National Union's attorney, GCIAA's

attorney provided a copy of the Agreement with all attachments.  The copy of the Agreement

provided on December 28, 2015 established that the Agreement had been previously executed

by the president of the GCIAA and by the GCIAA's board attorney on December 14, 2015, the

day before the unsigned, incomplete "final draft" was sent to National Union.  A true and

correct copy of the Agreement provided to National Union on December 28, 2014 is attached

hereto as **Exhibit M**.

**COUNT I**
**(National Union Has No Duty to Defend or Indemnify GCIAA Because No Suit Has Been Filed Against GCIAA)**

34.    National Union adopts and realleges the allegations of Paragraphs 1 through 33 as Paragraph 34 as though fully set forth herein.

35.    The National Union Policies only potentially require it to defend and indemnify a suit against the insured seeking damages for covered property damage caused by an occurrence.

36.    The various administrative actions, letters and agreements between GCIAA and the Federal Aviation Administration, the Indiana Department of Environmental Management and/or other federal state and local agencies, under which the GCIAA voluntarily incurred obligations, expenses and assumed responsibility for the cleanup, remediation, and containment of contaminants or pollutants at and allegedly emanating from the CCS, do not constitute a suit seeking damages on account of property damage caused by an occurrence.

37.    GCIAA has not been sued in a court of law nor has it been subject to any coercive or adversarial proceedings instituted by the Federal Aviation Administration, the Indiana Department of Environmental Management and/or other federal state and local agencies with regard to the airport runway expansion project and the cleanup, remediation, and containment of contaminants or pollutants at and allegedly emanating from the CCS.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court declare that National Union has no duty to defend or indemnify GCIAA.

## COUNT II
### (The Contractual Liability Exclusion Bars Coverage)

38.    National Union adopts and realleges the allegations of Paragraphs 1 through 37 as Paragraph 38 as though fully set forth herein.

39.    Exclusion (a) to the National Union Policies excludes coverage for liability that an insured has assumed under a contract or agreement.

40.    GCIAA alleged liability arises out of various contacts and agreements between GCIAA the Federal Aviation Administration, the Indiana Department of Environmental Management and/or other federal state and local agencies

41.    The agreements pursuant to which GCIAA assumed liability are not incidental contracts as defined by the AIG Policies.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that it has no duty to defend or indemnify GCIAA under the National Union insurance policies.

## COUNT III
### (GCIAA Violated the Voluntary Payments Conditions of the National Union Policies)

42.    National Union adopts and realleges the allegations of Paragraphs 1 through 41 as paragraph 42 as though fully set forth herein.

43.    Condition 4.(c) of the National Union Policies that the insured shall not, except at his own cost, voluntarily make any payment or assume any obligation or incurring any expense other than first aid to others.

44.    GCIAA, through voluntarily acquiring the CCS and voluntarily participating in the Brownfield's Program, entering into the various agreements with the Federal Aviation

Administration, the Indiana Department of Environmental Management and/or other federal state and local agencies, voluntarily incurred obligations, expenses and assumed responsibility for the cleanup, remediation, and containment of contaminants or pollutants at and allegedly emanating from the CCS.

45.    By voluntarily assuming obligations and incurring expenses, GCIAA breached Condition 4.(c) of the National Union Policies.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that National Union has no duty to defend or indemnify GCIAA.

**COUNT IV**
**(GCIAA Breached the Notice Conditions of the National Union Policies)**

46.    National Union adopts and realleges the allegations of Paragraphs 1 through 45 as Paragraph 46 as though fully set forth herein.

47.    Condition 4.(a) of the National Union Policies provide that in the event of an occurrence, the insured shall give written notice containing the particulars and reasonably obtainable information with respect to the time, place and circumstances of the occurrence and the names and addresses of available witnesses to National Union and the named insured shall promptly take, at its own expense, all reasonable steps to prevent other property damage from arising out of same or similar circumstances.

48.    Condition 4.(b) of the National Union Policies also provides that it claim is made or suit is brought against the insured, the insured shall immediately forward every demand, notice , summons or other process received by the insured to National Union.

49.     GCIAA's breached the above notice conditions of the National Union Policies by failing to provide National Union with notice of the alleged occurrence as soon as possible and failing to immediately forward every alleged demand and notice that GCIAA received from the Indiana Department of Environmental Management, the FAA and other state and local governmental agencies in connection with the cleanup, remediation, and/or containment of contaminants or pollutants at and allegedly emanating from the CCS and onto the airport property.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and issue a declaration that National Union has no duty to defend or indemnify GCIAA.

### COUNT V
### (No Occurrence During Policy Periods)

50.     National Union adopts and realleges the allegations of Paragraphs 1 through 49 as Paragraph 50 as though fully set forth herein.

51.     The National Union Policies only potentially provide coverage for property damage which occurs during the policy period that is caused by an occurrence.

52.     To the extent that there is any alleged property damage caused by an "occurrence," which National Union denies, the alleged property damage for which GCIAA has assumed liability occurred after the expiration of the National Union Policy periods.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that National Union has no duty to defend or indemnify GCIAA.

**COUNT VI**
**(Not an Insured Risk)**

53.     National Union adopts and realleges the allegations of Paragraphs 1 through 52 as Paragraph 53 as though fully set forth herein.

54.     GCIAA's alleged liability for the cleanup, remediation, and/or containment of contaminants or pollutants at and allegedly emanating from the CCS arose out of its acquisition of CCS.

55.     At the time the National Union Polices were issued and in effect, GCIAA did not own or conduct any operations at CCS.  GCIAA did not acquire CCS until 2013, nearly 20 years after the expiration of the National Union Policies.

56.     GCIAA's potential liability for the cleanup, remediation, and/or containment of contaminants or pollutants at and allegedly emanating from the CCS and historical activities at CCS was not an insured risk contemplated by the parties at the time the National Union Policies were negotiated, underwritten, executed and in effect.  Therefore, the GCIAA's alleged liability is not covered by the National Union policies.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that National Union has no duty to defend or indemnify GCIAA.

**COUNT VII**
**(The Owned Property Exclusion Bars Coverage)**

57.     National Union adopts and realleges the allegations of Paragraphs 1 through 56 as Paragraph 57 as though fully set forth herein.

58.    Exclusion (i) to the National Union Policies excludes coverage for alleged property damage to property owned by or in care, custody or control of the insured.

59.    GCIAA's has potential liability for the cleanup, remediation, and/or containment of contaminants or pollutants at and allegedly emanating from the CCS onto the airport property.

60.    GCIAA owns CCS and the airport property, and therefore, it is being held potentially responsible for cleaning up property that it owns and is in its care custody and control.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that National Union has no duty to defend or indemnify GCIAA.

### COUNT VIII
### (The Pollution Exclusion Bars Coverage)

61.    National Union adopts and realleges the allegations of Paragraphs 1 through 60 as Paragraph 61 as though fully set forth herein.

62.    The National Union Policies contain a "Noise and Pollution and Other Perils Exclusion Clause" that excludes coverage for pollution and contamination.

63.    The purported "claims" for which GCIAA seeks coverage from National Union arise out of alleged pollution and contamination and are excluded from coverage.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that National Union has no duty to defend or indemnify GCIAA.

## COUNT VIII
## (GCIAA is not an Insured Under the Policies)

64.     National Union adopts and realleges the allegations of Paragraphs 1 through 60 as Paragraph 61 as though fully set forth herein.

65.     The named insured designated in the Declarations of the National Union Policies is the "Gary Regional Airport."

66.     The entity seeking coverage under the National Union Policies is the Gary / Chicago International Airport Authority.

67.     Upon information and belief, Gary Regional Airport is not the same legal entity as GCIAA. Information presently available to National Union indicates that the GCIAA was not created until after the expiration of the National Union Policies.

68.     The National Union policies require that the named insured obtain National Union's written consent to assign rights under the policies.

69.     Upon information and belief, Gary Regional Airport did not assign its rights under the National Union policies of GCIAA.

70.     Gary Regional Airport did not obtain National Union's written consent, by endorsement to the National Union Policies, to assign its interests under the policies to GCIAA.

71.     Therefore, GCIAA is not an insured under the National Union Policies.

WHEREFORE, the Plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, prays this Honorable Court to enter judgment in its favor and against Defendant and declare that GCIAA does not qualify as an insured and that National Union has no duty to defend or indemnify GCIAA.

NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA

By:_____s/ James R. Murray_____
            Attorneys for Plaintiff

James R. Murray (jmurray@tresslerllp.com)
Richard Heytow (rheytow@tresslerllp.com)
Tressler LLP
233 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606
312-637-4000
#676606